Good morning it is the court your honors. I'm representing Mr. Takaharo Thomas Matsuba and I intend to use 15 of the 20 minutes of this argument and I'll reserve one minute for rebuttal. Okay so just if we could just stop the clock real quick. Mr. Stewart you're okay with that split? I am your honor. Okay then let's go ahead we'll go ahead and reset the clock then for Ms. Conroy for 15 and Ms. Conroy keep track of your time. I'll try to remember one minute but ultimately you got to make sure you you say something about that okay. I will thank you. All right you may proceed. So I am going to be discussing two issues this morning. The first is the Brady issue and then I will follow that with the loss restitution issue. Okay so in this case Ms. Wynn was a government witness and I think the parties are in agreement that under the three prongs of Brady that evidence that was in fact not disclosed was favorable to Mr. Matsuba. Now where the parties diverge is whether in fact the government's turning that over and the last day of trial cured any prejudice Mr. Matsuba had may experienced and it's our contention that it absolutely did not. He did not have substantial opportunity to both use the material and he was not able to cure the prejudice. Now the government essentially kind of minimizes this as Ms. Wynn testified that Mr. Matsuba sent her an email, the government disclosed the emails, the defense was unable to show that Peter Naum was titled as the sender of the email and everything was fixed. But it really runs much broader and much wider than that. Ms. Wynn's testimony was essentially threefold. One, she spoke on the phone with Thomas regarding these documents in her file that she needed to obtain. Two, that she then received an email from Thomas and three, that those documents were attached to the document and they were substantially altered from the way she'd initially submitted them. Now Thomas's whole defense was made clear from the very get-go of trial that he in fact did not work in the short sale department, had never worked in the short sale department and had never engaged in any type of forgery. So with her testimony she was the only homeowner that essentially implicated Thomas in some type of involvement in the short sale department and also engaging in forgery. And Ms. McConroy, if I could just jump in real quick, I mean I think the government's probably going to argue, so I want to get your take now, they're going to say actually the way this mix-up happened with the emails, it made the government's witness look worse because she took the stand and said one thing and then is confronted with emails and has to admit that her testimony was wrong. So this actually was not a bad thing for her defense and what's your response to that? Well respectfully I would absolutely disagree because she was the only homeowner who testified at trial and the only homeowner who in any way implicated Thomas to any type of participation in forgery. I think the government itself, their own actions continue to imply all the way through redirect that she in fact was communicating with Thomas. And when you go to the record at, I believe it's 1090 and 1091, they continue to ask her, but who did you believe you were speaking with? Who did you think you were talking with? Who did you think who was sending you the emails? Which was absolutely not relevant in any way, who she thought was sending her the emails, but this was their missing link to implicate Thomas in this short sale and the forgery. Otherwise there simply was no evidence. He worked in an accounting department, isolated in a little back room. He bought the lunches and took the dogs for a walk. So the evidence was extremely weak against Thomas in this case. So I would not say in any way that her testimony was harmful. They continue to use her testimony to their advantage. And I believe that flows into the NAPU issue as well. And the fact that, you know, when you look at the history of this case, eight years before trial, Ms. Nguyen met with the FBI agent and then she forwarded that email with Peter Nam as the sender's name on there. And the government was in possession of that for eight years before trial and yet presented Ms. Nguyen's testimony as she had spoken with Thomas and received forged documents from Thomas. So I would contend that was the testimony false. The government had every reason to know it was false. Well, what difference would it have made in the way the trial was, the defense was presented if you had known a year or six months before the trial? What difference would it have made in how you approach the case? Well, that's exactly the problem is I think the defense would have case differently and that's how we weren't able to use it effectively. One, the defense would have called Peter Nam as a witness to in fact testify that he was the one that one, spoke on the phone with Ms. Nguyen. Two, that he was in fact the sender of the email. And three, he was the one that attached those documents that were alleged to be altered and forged. Two, I think the government or the defense would have called the witness to in fact testify that all of the alterations on those documents provided to Ms. Nguyen were not made by Mr. Matsu but that was not his writing. And so there's also, why couldn't you have called Peter Nam after the disclosure of the emails? Well, this was at the very, very end of trial. I think to ask, I'm sorry, it was before the defense case. There was one witness in the defense case. It was the last government witness. I think what, I cited a case from the Southern District of New York in my brief and essentially the real problem here is what, as I just stated, we put on a document examiner. We would put on Peter Nam. These are things that happened at the very end of trial that this evidence should have been provided far in advance. Sometimes you can't begin compiling documents and witnesses at the very close of a trial. That's the purpose of Brady to disclose that evidence in advance. As to the government's arguments regarding substantial evidence of proof of Mr. Matsu's guilt as well, I just wanted to point out a couple of things. I kind of go through their arguments in my response brief and I wanted to address the fact that there were two counts and we would ask that the court reverse as to both counts. The government may argue, and I believe they did in a footnote, that reversal wouldn't be required as to count 12. But the government not only charged Mr. Matsu with aiding and abetting liability, there was also a Pinkerton instruction given in the court's jury instructions. And as the fact that Ms. Wynn was the only witness that was not a cooperating witness, the only homeowner linking Mr. Matsu to any type of forgery or any involvement in the short sale department, I would say reversal would be required on both of those counts. And if there are no other questions as to this, I'll briefly address the loss issue in this case. We're essentially asking the court to remand. The key contention that resulted in a substantial increase in the base offense level was that the Matsu's contended that there was no loss and that gain could not be used as an alternate substitute for loss. There was substantial litigation prior to the sentencing hearing and the key problem here is in the sentencing transcript, the district court simply does not address those key questions before proceeding to use gain as a basis for an enhancement. The district court did not determine, okay, is there a loss? And the district court did not determine that loss could not reasonably be determined, so gain would be a substitute. But didn't the district court specifically say that he'd used this as a matter of loss, and so therefore he ruled on that question? I'm sorry, I was not able to hear you. I'm sorry. Didn't the district court say that this is a question of loss, and so that means that he did rule that loss was determinable? I don't believe so, because it was the government's position that this was a gain, and they were going to use gain. They were going to use rental income as the basis for the enhancement on the base level. Of the government's opinion, what does that mean? He was lost under the Harper theory. But as I addressed in my brief, gain does not equal loss. The commentary note three to TV 1.1 makes it explicitly clear you have to determine first, is there a loss? Can it not be reasonably determined? And that simply wasn't the case here based on the supporting documentation provided. Even though it's not Mr. Matsuba's burden to prove this, he established to the court that loss could be reasonably determined in this case. And the district court simply did not rule on that. It just adopted gain and used that as the increased offense level. But the district court didn't say gain. He said loss. But they're not a substitute. He needed to first make those two findings that there was a loss, but it couldn't reasonably be determined because there were alternative ways of determining loss, which was laid out in the declaration of Mr. Knudsen. That's, I believe, at 235 in the docket. And the ways in which the financial institutions, which weren't even considered in the calculation, could have easily provided lost figures to the government. They simply didn't do it. And for those reasons, we would ask that the loss as well as the restitution amount be remanded to the district court to make the specific factual findings required under Rule 32 and proceed with a full evidentiary hearing as to the loss calculation and whether it could, in fact, be reasonably determined. Why doesn't the record show on pages, the ER 77 and 78, where the judge goes through and says the big question here is the amount of loss and the guideline level. And then he goes through all of the things that he considered, including there's no question after reading all the documents that there's the government accountant and experts from both sides. And then he goes on to say he's convinced that what the loss amount is. Why doesn't that satisfy the requirements? He could have done it in more detail, but why isn't that sufficient to justify under Rule 32 the finding of what the loss is? Well, as I discussed in my brief, he needed to make specific factual findings in response to that. And it's a rather sparse ruling that doesn't give this court any opportunity to review what the basis for his finding was. And that's why we would need the remand. We have no reason why he said it's loss. So, for that reason, we would ask for the remand. If there's no further questions, I would. I'm sorry. I have one question on the restitution. So, the district court judge backed out mortgage payments, but did not back out HOA fees or maintenance fees. Is that correct? That's correct. Is what's the reason why he separated those different fees? Well, I think, well, no, I think that basically we need to consider offsets. I believe that his logic was because that if you didn't pay your HOA or you didn't pay your property taxes or whatever the case, that would not result in foreclosure. I don't believe that's the proper analysis. The proper analysis is what was the actual loss. And you can't basically not consider the offset. Otherwise, it is a windfall for the victim. They would have had to pay their HOAs had they been residing there. Right. It seems like the district court adopted is it a necessary fee standard? And do you know where that came from? I don't. I believe that the logic was that they were implying that if paying certain things would not have resulted in foreclosure, then that was not required as restitution. That was my understanding. And with that, I would defer to my co-counsel. Thank you. Okay, Miss Conrad, before we get started with co-counsel, you want to save your remaining two minutes for rebuttal? Yes, please. Thank you. Very well. Okay. All right. Mr. Stewart, are you still there? I'm here, Your Honor. All right. You have five minutes and you may proceed. Thank you. Thank you. I wanted to talk a little bit about the Katshedzian case. I hope I'm pronouncing that correctly. From 2018, by this court, when you're looking at the juror issue in our case, we have two jurors that we are firmly convinced should not have should have been kicked by the court for cause. The second one is the interesting one with Katshedzian because the facts are almost the same as our case. In Katshedzian, the juror was a victim of I.D. theft some five years ago. In our case in Matsuba, juror M.M. at the time of jury selection was going through the criminal justice system as a victim of I.D. theft. The government in their brief somehow thinks that that softens the effect. I would In Katshedzian, she said, I would want to put my personal stuff aside, but I don't honestly know if I could, which I think we can all agree is equivocal. In this case, in Matsuba, when the question of putting things aside came up, the juror said, M.M. said, I would hope so that I could do it. I would argue that's also very equivocal. In both cases, Katshedzian and Matsuba, the court used a question that asked, but if it turns out you're going through this process and you feel you can't, it's not working, would you tell us? Answer yes. In Matsuba, almost the same question. If for some reason you found out, hey, for emotional reasons or whatever, I can't do that, you could tell us? Answer yes. But in both of those instances, it is not a commitment to be fair. Neither juror in either case were asked, can you be fair? And so I think in terms of Katshedzian and then Merritt, a case that came out about a month later in 2018, strongly supports our position. Even stronger, I would argue, is the first juror, K.W. This is a gentleman who twice told the district court he really didn't think he could be fair in this case at one point. He said that, I don't think I can. And the district court asked him, you don't think you can tell us that you'd have a problem? Perspective juror, no, I pretty, I think I might have a problem. And then the district court went on to ask that same question about you get down the road in the deliberations or the case of something bothers you, can you tell us? That isn't asking for a commitment. Neither one of these jurors in our case in Matsuba gave a commitment like that. And both of them should have been gone for cause. This is Judge Molloy. Can you explain to me what that question means, that follow up question of at some point during this process, you feel uncomfortable? Is that just during the voir dire? Or is that I'm sitting as a juror been selected, and I now don't feel comfortable. The I don't understand what that question means, or what's, what is its significance? Yes, sure. And I agree, you can interpret it either way. I interpret it as look, you're, you're now in this case, you're deliberating or you're listening to the evidence. Will you tell us if all of a sudden your bias pops up? And you really you can't go into a jury trial with a juror like that. You have to go in with people that are going to commit that they're fair. So I would suggest that this question in both Kitchijian and in Matsuba is really not helpful, just doesn't help us get to the bottom of whether these people will be fair. We asked for a jury voir dire, and we were denied it in Matsuba. Obviously, it's a question that each one of the defense lawyers and probably government counsel would have asked, can you be fair? And unfortunately, we're not able to ask that. Even if we were to agree with you, what was the prejudice here since neither of those jurors sat on the actual grand jury? Sure, it took our parametries from 10 down to eight. That's the prejudice. Did you ask for more parametries? I don't believe we did, Your Honor. Could you have under the rules? Honestly, I don't know. I suppose we could have, I could predict what the answer would have been from the district court. But I suppose we could have. And how do you distinguish Justice Ginsburg's determination in Martinez-Salazar from your argument that you were prejudiced? The only thing that I can point to, Your Honor, is the Martinez-Salazar language talking about the trial court deliberately misapplying the law. And that seems to me to be the distinction between Martinez-Salazar and the Matsuba case, in that the trial court in Matsuba misapplied the law here. All right, unless there are any other questions from the court. Thank you, Mr. Stewart. It's always good to hear your voice. Better to see you, but it's still good to hear your voice. Thank you very much, Your Honor. All right, Mr. Handel, can you hear us? I can hear you. Can you hear me, Your Honor? We can, and you may proceed. All right, good morning, Your Honors. May it please the court, Josh Handel for the United States. Just a roadmap for the court a bit this morning. I'm planning to briefly touch on the peremptory challenges issue, which we think is clearly foreclosed by the Supreme Court's decision in the United States versus Martinez-Salazar. And then moving on from that, I'll split my time between the Brady-Annapur claims and the loss calculation issue. So turning first to the peremptory challenges issue, I would point out right at the outset that the big material difference between this court's decision in Kitchezian and the case that we have here is that in Kitchezian, the juror, the prospective juror who is challenged for a cause was actually impaneled and served on the jury and deliberated and voted on the verdict. And here, every juror who is challenged for a cause by either party was ultimately knocked out either by the district court or by peremptory challenges. And that's why I think this factual scenario is right on all fours with Martinez-Salazar. As Judge Molloy pointed out, in Martinez-Salazar, the Supreme Court held that a defendant's exercise of peremptory challenges pursuant to Rule 24B is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for a cause. The court explained that defendants who have raised an unsuccessful forecaused challenge to a prospective juror face a choice. And that choice is they can either let the juror be impaneled. And then in the event of conviction, pursue a Sixth Amendment remedy on appeal. Or they can use a peremptory challenge to remove the prospective juror. But they can't do both. And here between, as I mentioned, between the government's peremptory challenges and the Matsuba's peremptory challenges, every single one of the prospective jurors that either party had challenged for cause was excluded from the jury. And that's the end of the discussion as far as... Counsel, this is Judge Molloy. Isn't it the case, though, that you agreed that K.W. should have been excused for cause? Yes, Your Honor. Yes, Your Honor, that's right. As we stated on page 15 of our appellate brief, we believed then and we continue to believe that certain statements that K.W. made were problematic and qualified him for a cause excusal. But the district court saw things motivations and we don't think it was an abuse of discretion for the district courts who have rejected our objection or the Matsuba's objection to that prospective juror. And I would just reiterate that that's all kind of a sideshow here because under Martinez-Salazar, there is no conceivable prejudice in this situation. And just to address... What about counsel's argument that he lost to peremptory challenges? Right. So, I mean, in Martinez-Salazar, the Supreme Court said that peremptory challenges, that the loss of a peremptory challenge is not an injury of a constitutional dimension. And it simply said, and I have the quote right here, that the Supreme Court holds that if the defendant elects to cure such an error by exercising a peremptory challenge and is subsequently convicted by a jury on which no biased jurors pass, he has not been deprived of any rule-based or constitutional rights. So again, I think that just flatly forecloses their argument here to the extent that my friend on the other side argued that there's some exceptions to Martinez-Salazar. It's true that the Supreme Court said it was not addressing a situation where the district judge had deliberately misapplied the law in order to force the defendants to use a peremptory challenge to correct the court's error, but the Matsubas do not appear to have suggested that that's the case here. It certainly isn't. The district court offered a reasonable rationale for its discretionary determination not to excuse KW or MM. With respect to KW, the court expressed the view that KW's demeanor and shifting explanation suggested that he was not actually biased, but was just instead eager to try to get out of jury duty. With respect to MM, the court credited her forthrightness and her expressed willingness to set aside her personal experiences in pursuit of objectivity. Neither of those rationales, even if the government disagreed with them, even if the defense disagreed with them, neither of those rationales have been a deliberate misapplication of law designed to gratuitously deprive the defendants of peremptory challenges so as to fit into that narrow exception to Martinez-Salazar. Is there something in the record that justifies the court's reasoning and determination other than his gut feeling that, I think the guy just trying to get out of jury service, is there something on the record that would justify that? And then I want to go back to a question that was asked of other counsel, but do you agree that the judge didn't allow attorney voir dire? I gather that's the case, but did he allow questions to be submitted after he completed his voir dire? And in those questions, did anybody say, would you please ask KW if he could be fair or MM? That's a mouthful of questions. Right, so I'll try to tackle those in turn. So with respect to your first question, which I think was, was there anything in the record that the district court was basing this on, or was it just kind of his gut feeling about KW's demeanor? So the district court did point out that at the beginning, he had asked all the jurors something like, and I'm not going to get the is there any reason, any personal experience or professional experience that would lead you to not be able to objectively decide this case? And KW did not volunteer anything at that point. And then it was only later that KW all of a sudden brought up, well, I'm a tax accountant, and I have this idea of how the IRS does things. I have this idea of how mortgage companies do things. And so the district court decided that sort of based on those shifting positions that KW had events throughout the course of jury selection, that he was probably trying to get out of jury duty. As to your second question, I do not believe there was an extension of voir dire so that the government council and defense council could ask individualized questions to members of the jury pool. I will caveat that by saying that I was not trial counsel below. So if either of my friends on the other side want to correct that, I'd invite them to do so. But again, I do think that all of this is somewhat beside the point, just because the Supreme Court's decision in Martinez-Salazar clearly says that even if there were an otherwise reversible abuse of discretion in the district court's denial of these four cause challenges, there is not prejudice when jurors have been excluded from the jury by use of peremptory challenges. And I do want to get to the other issues, so unless there are further questions on that. All right, so turning first to Brady and Napu, the gravamen of these claims is Christine Wynn's incorrect testimony that Thomas Matsuba had sent her an email attaching her mortgage documents, when in fact that email came from another Matsuba company employee named Peter Nam. Now, as we explained on pages 24 through 28 of our brief, we don't believe Mr. Matsuba has made out even the prima facie elements of the Napu or Brady claims here, and I'm happy to get into the reasons why that is. But the point I'd like to focus on first is that there's simply no reasonable possibility of prejudice under these circumstances. As soon as the trial prosecutors discovered the Peter Nam email that refuted this aspect of Ms. Wynn's testimony, they immediately turned it over to defense counsel. The government then offered to recall Ms. Wynn for renewed cross-examination on the very next day of trial after her initial testimony. The court allowed that recross to go forward. Defense counsel proceeded to extensively question her using the Peter Nam email as impeachment evidence. So Ms. Wynn's misstatement was exposed on the witness stand, and the jury had the impeachment material in hand well before it began deliberating. Under this court's case law, no prejudice result and no reversal is warranted where the defendant is able to expose a witness's misstatement with contrary evidence on cross-examination. And I would point specifically to this court's decision in United States v. Alvarez, which we cited on page 27 of our brief, and I think is directly on point here. So in Alvarez, you had a government witness testify, and the defense then asked the prosecutor to go back and examine the witness's rough notes, which had not been produced in the Brady disclosure. The prosecutor did so and discovered discrepancies between the notes and the testimony, and the government made a belated disclosure of that material to the defense. In response, the defendant, just like Mr. Matsuba did here, moved for a mistrial or in the alternative to strike the witness's testimony. And the district court denied that motion, but it did allow the recall the witness, at which point the defendant cross-examined him with the aid of the new impeachment material. And on appeal, this court held that no reversible error occurred below, because the defendant was able to cross-examine the witness fully regarding the discrepancies between his testimony and the newly disclosed impeachment material. So what about Ms. Conway's argument that they would have preferred to Peter Nahm to testify? Sure. So I don't know that there was anything preventing them from calling Peter Nahm to testify. As I believe Judge Boumetier, you pointed out during my friend's presentation, Ms. Nguyen testified during the government's case-in-chief. This was before the defense had even begun calling any witnesses. And so they certainly could have added Peter Nahm to their timing concerns or issues with subpoenaing him or something like that. They could have moved for a continuance. They never sought any of that relief from the district court. So I think it's unavailable to them to point to that as prejudice in this court when they didn't even try to ameliorate any of that purported prejudice below. And to the extent that their brief argues that, maybe the jury thought that Peter Nahm was simply an alias of Thomas Matsuba, and therefore this cross-examination was not effective. That's contradicted by other parts of the record. Multiple government witnesses testified to the existence of Peter Nahm, to his role in the Matsuba company. I believe Julio Segovia and Jane Matsuba Garcia both testified to that. Defense counsel held up a picture of Peter Nahm when they were cross-examining Ms. Nguyen. So I just don't think there's any availing prejudice there. And then one other question on that, counsel. Your brief refers to Ms. Nguyen's testimony as mistaken versus false. What's the basis of concluding that? Sure. So that's essentially, that's based on the absence of an allegation that Ms. Nguyen had deliberately perjured herself. And I don't see anywhere in the Matsuba's brief any allegation that Ms. Nguyen deliberately perjured herself. Certainly that was not a finding below. That was, there is just no indication anywhere in the trial record that this is anything other than a case of mistaken recollection. There was no finding of mistake. It's just left unsaid. Well, because it was not even put forward that she had intentionally falsified testimony or anything like that. In fact, the defendants here did not even put forward a true NAPU claim below. They just framed this in terms of Brady. So they never said that Ms. Nguyen falsely testified. In fact, I think when this is being presented to the district court, there's a point at which defense counsel begins to say, in fact, this is excerpts of record page 1055. Right now we have false. I wouldn't say false. It's untrue. He stepped back from even alleging that this is actually false or perjured testimony. And again, there's nothing in the record suggesting that this is perjured testimony. There's certainly nothing in the record suggesting that the anything like that. And because of that, because there is no indication or even a straightforward allegation in the Matsuba's briefing that Ms. Nguyen knowingly perjured herself or that the prosecutors deliberately elicited false testimony. I think Mr. Matsuba's NAPU claim would fail on the first prong, even if he could otherwise establish prejudice. So at the end of the day, what you have here is a witness who misremembered an email exchange that had occurred almost nine years prior to her in-court testimony. The government provided the reference email to the defense and recalled her to the stand for renewed cross-examination on the very next day of trial. She was then thoroughly cross-examined with this new impeachment material. There was no deliberate deception of the court or the jury and any possible prejudice was cured by the defendant's use of this evidence trial. Unless the court has further questions on Ms. Nguyen's testimony, I want to use the rest of my time on the loss calculation issue. Sure. Okay. So when it came time to determine the loss, the district court proceeded in two steps. First at sentencing, it determined by clear and convincing evidence that the government had established a loss to the homeowner victim in excess of $3.5 million. And as the court noted at that time, that was an extremely conservative estimate based on the competing experts submissions from the parties, which in the district court's view proved by a preponderance of the evidence, a loss, quote, over $9.5 million, probably closer to 50, end quote. But the district court explicitly cut a break to defendants in holding them accountable only for a loss exceeding the $3.5 million threshold in the guidelines. Then at restitution, the court engaged in a more granular analysis of the loss and determined that the Matsubas were responsible for $12.2 million in losses to identifiable homeowner victims. And I think the comparison between those two numbers, the $3.5 million threshold that the court assessed for sentencing guidelines purposes compared to the $12.2 million figure it found as the actual loss at restitution just reinforces how conservatively the court approached the loss calculation below. Now it's true that the Matsubas have leveled a more basic objection here, which is that it's inappropriate as a matter of law to use the rent that the Matsuba misappropriated from the homeowner victims as a basis for estimating actual loss. But as we explained in our brief, this court held in United States v. Harper that in a mortgage rescue fraud that operated by misappropriating the rental value of the victim's home, the rents taken by the defendants are the best available estimate of actual loss to homeowner victims. And the facts of Harper are materially indistinguishable from this case. There you had a mortgage rescue conspiracy that convinced homeowners to sign over their homes with a promise that they'd escape their debts and avoid foreclosure. Conspirators then charged rent on the homes for as long as they could before ultimately letting the foreclosures happen anyway without following through on any of their promises to the original homeowners. Counsel, did the district court make a sufficient that the court was agreeing with the government's calculation of loss under the Harper theory? So the district court did not, on the record, mention Harper. I think the district court did everything it needed to do to do at sentencing. So the two disputes that the parties had below and that they renew on appeal are number one, did the government establish a loss at all? And number two, what was the amount of that loss? And the district court clearly determined that there was a loss. And it estimated that loss as exceeding $3.5 million for sentencing. Now, I'm certainly not going to stand here and tell you that I think this transcript reflects the platonic ideal of meticulous sentencing hearings. But the court, it absolutely could have been clearer about its reasoning. But the qualitative dispute here as to the force and effect of Harper is a question of law that this court is well-equipped to make without any quantitative dispute was ultimately resolved at a more granular level in the course of assessing restitution. And I understand also that perhaps deferring adjudication to the restitution phase was somewhat procedurally unorthodox. Although again, I'd point out as we did in our brief that the Matsubas did not object to that plan below and they haven't cited any authority establishing it as per se erroneous. But even if it was error to do that, the Matsubas certainly aren't in a position to complain about it because they benefited from the court's imposition of sentence on the $3.5 million threshold rather than the $9.5 million threshold that would have applied based on the court's later assessment of an actual loss of $12.2 million. So again, I think there is plenty in the record to affirm here. And with respect to the main point of contention between the parties as to loss calculation, that's a question of law. It just has to do with whether United States v. Harper is on point here and whether it remains good law. And just getting back to Harper, this court said in that decision, it is, quote, elusive that the rent the defendant received represent a value that he took from the owner victim. And thus the use of that figure has the virtue of representing actual loss, intended loss, and even the offender's gain. So by its own terms, Harper reached a determination of actual loss. And that amount, the rental value that was misappropriated from the homeowner victim, was the same actual loss that the government proffers here. Counsel, before your time ends, can I ask a quick question on restitution? I'm not sure I quite understand why the district court distinguished mortgage payments versus HOA fees versus maintenance fees. It seems like that all of those fees go to the benefit of the victim. And so why weren't they all backed out of the restitution fee? Right. So I believe that the district court's reasoning goes to what was absolutely necessary to continue perpetuating this fraud versus what were volitional expenses that we can't necessarily impute to the homeowner victim, absent the fraud. So you're correct, Your Honor, the district court did end up crediting the Matsubas for any mortgage payments that they had made on the property because the homeowner victims would necessarily have had to continue making those payments. In order to stave off foreclosure, but it didn't credit them for other items like maintenance, gardening, cool services, HOA fees, because the Matsubas had not demonstrated that the homeowner victim would have extended those same amounts toward those same ends had they remained in control of their homes, absent the fraud. I see that my time has expired. Unless the court has further questions, I'll rest on my brief and respectfully request you affirm the judgment for a while. Thank you. All right. Thank you, counsel. Now we'll go back to Ms. Conroy. You may proceed. Just briefly, I believe it's quite telling the way the government concluded their redirect of Ms. Wynn after she was recalled. The question was, and this is at ER 1090, so who did you understand to be sending you the documents? Answer, Tom. And was that what you said on Friday and today? Yes. So the fact that somebody else, do you know anybody named Peter? No, no, I don't. And the government continued again, regardless of who sent you the email, who was your understanding of who was sending you the documents? It was from Tom. There was absolutely no reason to engage in that line of questioning if it had been clarified that Tom did not have any participation in any of this, that he did not speak with Ms. Wynn, that he did not email her the documents, and that he did not attach the forged documents. The whole purpose of that line of questioning was to use Ms. Wynn as the key witness in linking Tom to participation in forgery, of which there was no other testimony, and participation in the short sale department. So for those reasons, we would ask the court to reverse this to counts one and nine. I'm sorry. Counsel, what do you say in response to the argument that counsel below never said that they wanted to call, defense counsel never said that they wanted to turn on the clock? Well, I think it was more than just putting on Peter Nahm as a witness. It was putting on a document examiner to testify that these documents that had been turned over to Ms. Wynn, that was not Mr. Matsuba's handwriting on those documents. Someone needed to establish that he had not participated in forgery. Was that record below that you wanted to have that document examiner put on as a witness? I believe the record below did not establish all of the things until the written motion was filed requesting a new trial as to what would have been done. At the time, he simply moved to strike her testimony and moved for a mistrial, and then supplemented later with written motion documenting what he would have done had he received this information in advance. Now, as to the loss issue, I will let my counsel's concessions speak for themselves regarding the district court's lack of specificity in any of the findings. And with that reason, we would ask the court remand as to both the loss and restitution. Thank you. All right. Thank you very much, counsel. Mr. Stewart, I can give you 30 seconds if there's anything you want to add. I'll submit, your honor. Thank you. All right. Very well. Thank you, counsel, for your briefing argument in this case. Very interesting case. This case has now been submitted, and we'll move on to the last case on our calendar today, which is United States v. Obagi.
judges: Owens, Bumatay, Molloy